**Robert MYERS, David Pinski, Charles Montgomery, Kenneth West, Nicholas Ignelzi, and Molie Oliver, Plaintiffs,**

**v.**

**Joel BRUNSVOLD, Tony Mayville, Julie Curry, Bryce Sheriff, Roger Frazier, Sam Flood, Michelle Cusamano, and Ed Jackson, all Individually and as Employees and Officials of the State of Illinois, Defendants.**

No. 06–3276.

United States District Court, C.D. Illinois, Springfield Division.

May 22, 2009.

John Edward Kerley, Kerley & Associates, Springfield, IL, for Plaintiff.

Douglas J. Quivey, Londrigan Potter & Randle, Karen McNaught, Illinois Attorney General, Springfield, IL, for Defendant.

## OPINION

RICHARD MILLS, District Judge:

Were the Plaintiffs laid off for political reasons?

The Court concludes that they have not met their burden.

Defendants' motion for summary judgment is allowed.

All of the Plaintiffs are former Site Superintendents with the Illinois Department of Natural Resources ("IDNR"), who before being laid off worked at various natural resource sites around the State of Illinois. The Defendants contend that the

Plaintiffs' positions were abolished for budgetary reasons.

The Plaintiffs filed a two-count complaint, alleging in Count I that they were laid off from their positions with IDNR for political reasons in violation of their First Amendment rights. In Count II, the Plaintiffs assert that they were deprived of their positions as Site Superintendents without due process of law.

The Defendants contend that they are entitled to summary judgment for a number of reasons: (1) there is no evidence that political affiliation was a motivating factor in the decision to lay off any of the Plaintiffs; (2) the Plaintiffs cannot meet their burden of showing that the budgetary reason for the layoff was a pretext; (3) many of the Defendants had no personal involvement in the layoff selection process affecting the Plaintiffs' employment; (4) three of the six Plaintiffs cannot, as a matter of law bring a political affiliation claim because they held *Rutan*-exempt positions, which allow political affiliation to be considered when making employment decisions;[1] (5) the Plaintiffs were provided procedural due process; (6) the Defendants are entitled to qualified immunity; (7) the Eleventh Amendment bars the claims and damages against the Defendants in their official capacities; and (8) one Plaintiff failed to mitigate his damages.

## I.  BACKGROUND

### (A)

The Plaintiffs:

Robert Myers was Site Superintendent at Weinberg–King State Park from approximately September 16, 1986 until January 14, 2005.

David Pinski was Site Superintendent at the Momence Wetlands from approximately February 1, 2001 until January 14, 2005.

Charles Montgomery was Site Superintendent at Babe Woodyard State Natural Area from approximately June 25, 2000 until January 14, 2005.

Kenneth West was Site Superintendent at the Trail of Tears State Forest from approximately January 1991 until January 14, 2005.

Nicholas Ignelzi was Site Superintendent at the Ray Norbut State Fish & Wildlife Area from approximately 1990 until January 14, 2005.[2]

Molie Oliver was Site Superintendent at Tunnel Hill State Trail from approximately January 4, 1994 until January 14, 2005.[3]

The Defendants:

Julie Curry was Deputy Governor of Illinois at the time of the Plaintiffs' layoff and approved the layoff plan on behalf of Illinois Central Management Services ("CMS").[4] Curry had no involvement in selecting the Plaintiffs to be included and never saw the final layoff plan that included the names of the people who were laid off.

Joel Brunsvold was the Director of the IDNR at the time of the layoffs. The Defendants allege that Brunsvold opposed

---

**1.**  *See Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990).

**2.**  In approximately July 2006, Ignelzi was rehired by IDNR as a Site Technician II at the Sparta Shooting Complex and he retired from IDNR approximately five months later.

**3.**  Approximately nine months later, Oliver was rehired by IDNR as a Natural Resource Coordinator at Cache River State Natural Area where she remains employed.

**4.**  On December 12, 2008, the parties stipulated to dismiss former Governor Rod Blagojevich as a Defendant.

the layoff and basically had no involvement in the layoff process.

Clifford "Sam" Flood has been Acting Director of IDNR since January 1, 2006 and has been with IDNR in some capacity since October 16, 2005. Flood was not involved with the layoff in any way, shape or form and was not employed at IDNR at the time of the layoff.

Brice Sheriff was Deputy Director at IDNR at the time the Plaintiffs were laid off and worked at IDNR for approximately one year. After receiving budget information from the IDNR fiscal office and in conjunction with the fiscal office, Sheriff communicated to the IDNR Office Directors the need for the layoff, the numbers each office needed to cut, and he later communicated the decision that no sites would be closed. Sheriff was not involved in the process of selecting individuals to be laid off other than reviewing the proposals and making sure that the final plan worked operationally. He did not know any of the Plaintiffs.

Tony Mayville has been Director of the Office of Land Management at IDNR for approximately five years. In consultation with others, Mayville made the decision as to which positions would be included in the layoff plan.

Michelle Cusamano has been Director of Human Resources at IDNR, since July of 2003. As it related to personnel issues and also to a certain extent operational issues, Cusamano advised Mayville and other Office Directors regarding the layoffs.

Edward Jackson was Labor Relations Administrator for IDNR from approximately September 1998 until April of 2008.

Roger Frazier was Deputy Director at IDNR from April of 2003 until June 15, 2004. Frazier had absolutely no involvement with the layoff.

(B)

As Site Superintendents, all of the Plaintiffs were directly supervised by one of five IDNR Regional Land Managers. The Regional Land Managers all reported to the Division Chief of Parks and Recreation, Tim Hickmann. During the selection process and at the time of the Plaintiffs' layoffs, Hickmann reported to Mayville, who is the Director of the Office of Land Management. At the same time, Mayville reported to Sheriff, the Deputy Director of IDNR. Sheriff reported to Brunsvold, then-Director of IDNR. As a Director, Brunsvold was a Cabinet Officer. The Defendants allege that on most issues relevant to this case, Brunsvold reported to Deputy Governor Curry, though the Plaintiffs state that he also spoke to Joe Cini on personnel issues.

IDNR Director of Human Resources Cusamano reported directly to Director Brunsvold. Edward Jackson reported to Cusamano. IDNR Employee Michele Brown, a Human Resources Specialist, served as the personnel liaison between the Office of Land Management and IDNR Human Resources and worked closely with Mayville and Tim Hickmann.

(C)

IDNR's stated reason for the layoffs affecting Plaintiffs' employment was lack of funds. The Defendants allege that when the legislature passed the FY 2005 budget, IDNR's budget was reduced by approximately 16.2% which translated into a $12.4 million decrease in personnel "headcount" appropriation.[5] After the budget

---

5. In support of this allegation, the Defendants point to the Civil Service Commission pro-

posed finding and its Findings and Decision. The Plaintiffs assert throughout their response

was passed by the legislature, it was left to IDNR to determine how the headcount reduction would be made. The need for such a reduction was communicated by IDNR's fiscal office to IDNR leadership. In conjunction with the fiscal office, IDNR leadership gave each Office Director a specific budget number that each Office had to meet. The IDNR fiscal office was the entity "driving" the numbers to each Office Director and the Office Directors worked with the fiscal office regarding the exact amount of headcount and spending they had to reduce. As it relates to the Plaintiffs' layoff, Mayville was informed that he had to discharge approximately 60 employees. The Defendants allege that after he was given the numbers, Mayville met with Tim Hickmann and Michele Brown to determine the best way to reduce the work force with the least amount of impact on the sites. The Plaintiffs dispute these allegations, contending that the two initial layoff plans that were prepared were not based on that consideration.

Tim Hickmann and Michele Brown were more familiar than Mayville with the operational needs of the sites. Besides meeting with Hickmann and Brown, Mayville also solicited and considered input from the Regional Land Managers. Mayville also showed his various layoff proposals to Cusamano and Jackson for their review. Although Mayville believes he ultimately made the decision regarding which positions were selected for layoff, Cusamano considered the decision to be jointly made. Jackson reviewed the layoff lists for compliance with contracts and personnel rules but was not involved in the selection process.

The Defendants allege that, based upon their background and political affiliations, neither Cusamano nor Jackson had any

incentive or reason to target Republicans to be laid-off. The Plaintiffs' dispute the Defendants' assertion, claiming that Cusamano and Jackson did have incentive to comply with requests made by Mayville, Hickmann and Brown to go along with the layoff plan in order to preserve their own status as IDNR employees, and to protect at least two people with whom they were politically aligned.

The Defendants further allege that Mayville, in conjunction with Hickmann and Brown, formulated at least three proposals for how best to reduce the budget and headcount. In one proposal, Mayville and Hickmann developed a plan that primarily selected employees that were eligible to retire. After the proposal was submitted to Cusamano for her review, it was dropped because of a possible disparate impact on persons based on age. Another proposal was formulated which would have closed some sites resulting in a bigger savings in operational dollars and fewer layoffs. Although the site closure proposal was the preferred option of Mayville and Hickmann, it was rejected because a policy decision was made that no parks would close. The proposal that developed into the final layoff plan spread the layoffs more widely across the state. The Plaintiffs contend that the fact that these other proposals were made is irrelevant to whether they were laid off for political reasons or received proper due process.

The Defendants assert that, in the final proposal, operational need was the fundamental factor used to determine which positions would be eliminated and the criteria used to select positions included but were not limited to: (1) proximity of sites and Superintendents to other sites, site complex locations, and to the regional of-

that the proposed findings and decision of the Civil Service Commission are inadmissible

and not binding on the parties in this litigation.

fice; (2) duties that could be performed by other employees taking into account work rules and prior retirements and jobs that did not get filled; (3) staffing requirements at various sites; (4) applicable continuous service rules; and (5) consistency and fairness. The Plaintiffs dispute these allegations and contend throughout their response brief that operational need was not the fundamental factor used in selecting those who were to be laid off.

Besides providing information to Mayville and Hickmann, Michele Brown's primary role was to provide input regarding which positions could be eliminated because there was duplication of services or places where duties could easily be absorbed by someone else. In developing what became the final plan, Mayville, Hickmann and Brown analyzed the entire Division to include creating and reviewing numerous reports regarding staffing levels, etc., and formulated contingencies as to how job duties could be reassigned and operational needs accomplished. When Mayville, Hickmann and Brown discussed how to accomplish the layoff, they talked in terms of positions and not by the names of people in positions. After Mayville and the other Office Mangers presented their final proposals to the Human Resources Department, Cusamano and Jackson drafted a preliminary layoff plan containing the position numbers but not name of employees to be laid off. Cusamano then signed on behalf of Brunsvold and the plan was submitted to Curry for CMS approval. After it was approved, the IDNR Human Resources Department prepared individual layoff notices and conducted interviews which resulted in bumping and other personnel actions until a final layoff plan with names could be approved by CMS. CMS then sent the official layoff notices.

(D)

Following the layoff, Myers's administrative Site Superintendent duties at Weinberg–King State Park were assumed by Regan Ramsey. Prior to the layoff, Ramsey was complex manager over a complex that included Weinberg–King. According to Myers, "Ramsey was a very high Republican, high-profile Republican." Conversely, Myers considered himself not to have a high political profile and to be one of the "little guys." Following the layoff, Pinski's administrative Site Superintendent duties at Momence Wetlands were assumed by Kathy Pangle. Prior to the layoff, Pangle was complex manager over a complex that included Momence Wetlands and Kankakee River and she had performed Pinski's duties before he was hired. Pangle is former Governor George Ryan's niece.

Following the layoff, Montgomery's administrative Site Superintendent duties at Babe Woodyard State Natural Area were assumed by John Hott, who prior to the layoff was Montgomery's immediate supervisor and a complex manager. Following the layoff, West's administrative Site Superintendent duties at Trail of Tears State Forest were assumed by Robert Martin, who was Site Superintendent at nearby Giant City State Park. In 2000, both Martin and West applied for the Giant City position. West asserts that Martin received the position in 2000 because of his Republican connections.

Following the layoff, Ignelzi's administrative Site Superintendent duties at Ray Norbut State Fish & Wildlife Area were assumed by Jim Assell, the Site Superintendent at Siloam Springs. Assell was at Ray Norbut when Ignelzi started as Site Superintendent. Later, the Site Superintendent duties at Ray Norbut were assumed by complex manager Regan Ramsey after Ray Norbut was added to the complex. Following the layoff, Oliver's ad-

ministrative Site Superintendent duties at Tunnel Hill State Trail were assumed by Bill Reynolds, who was Oliver's supervisor prior to the layoff. Immediately prior to the layoffs, all of the Plaintiffs worked at sites that were close in location to other IDNR sites. Specifically, as it relates to Oliver, the office at Tunnel Hill State Trail is approximately eight miles from Ferne Clyff State Park. West testified that Trail of Tears State Forest is approximately twenty miles from Giant City State Park. Trail of Tears State Forest is a small site and Giant City State Park is a large facility with major public facilities. According to Ignelzi, Siloam Springs State Park is about an hour north of Ray Norbut State Fish & Wildlife Area and unlike Ray Norbut, Siloam Springs has a lake and camping besides hunting. Montgomery testified that Babe Woodyard State Natural Area was a satellite of Kickapoo State Park. As it relates to Myers, Weinberg–King State Park was in a complex with Siloam Springs State Park and Nauvoo State Park. According to Pinski, his office for the Momence Wetlands was co-located at the Kankakee River State Park with the complex manager.

The Defendants allege that one of the primary reasons why the Plaintiffs were laid off is because of the locations of their sites near other sites and because their duties could be handled by other managers. The Plaintiffs dispute that allegation, contending that they could have performed the duties of those who were not laid off if those who eventually assumed Plaintiffs' duties were laid off instead of the Plaintiffs.

### (E)

Mayville did not know the political affiliation of any of the Plaintiffs. At no time when he was discussing the layoffs with any person did Mayville discuss the political affiliation or political support of any IDNR employee. Tim Hickmann never participated in a discussion relating to the layoffs in which political affiliation of IDNR employees was mentioned, nor did he hear of a discussion like that by other people. Hickmann does not know the political affiliation of the Plaintiffs. Hickmann did not select or recommend anyone to be on the layoff list because they had criticized IDNR or the Blagojevich Administration. In all of the discussions Michele Brown had with Hickmann and Mayville regarding the layoff, at no time did the political party or political affiliation of any employee get mentioned and she did not know the political affiliation of any of the Plaintiffs.

Cusamano did not participate in or hear about any discussions in which the political affiliation of employees who might be laid off was discussed and she did not know if any of the employees who were not laid off had support from any political party or administration. Jackson did not participate in, nor was he aware, of any discussions concerning the layoffs wherein political affiliation or political support of any IDNR employees was discussed and he does not believe political affiliation or support had any influence over who was selected to be laid off. Sheriff also had no discussions regarding the political affiliation of IDNR employees. Sheriff did not know the Plaintiffs and did not know which Department or Office they worked in. Brunsvold did not know any of the Plaintiffs. Brunsvold never looked at the layoff list and was not involved in the process of selecting individuals to be laid off. Finally, Curry had no involvement in deciding which positions would be selected for layoff and never saw the layoff list when it included names.

At a July 2004 regional land management meeting, West claims he asked May-

ville and others attending a question and answer session why the Sparta shooting complex and other projects were completed, given IDNR's alleged fiscal problems. This was the only time West talked to Mayville before he was given notification that he would be on the layoff list. West claims that he was told by others that they had heard from IDNR management that West would have been better off keeping quiet at regional meetings and not voicing his opinions. He, however, does not recall who told him this "gossip or hearsay."

### (F)

Mark Gerard was hired as Assistant Site Superintendent at Weinberg–King State Park on October 1, 2003. Gerard is the son-in-law of Defendant Frazier. Before Gerard was hired, Tim Hickmann and/or Michele Brown signed a request that the Assistant Site Superintendent position needed to be filled. When Gerard was hired, Mayville was not Director of Land Management. The Defendants allege that, before he was interviewed for the positions, Gerard completed a CMS employment test and a CMS 100 application. The Plaintiffs claim that Gerard did not properly complete his CMS 100 application, which should have disqualified him from consideration for the position he received. Before Gerard was hired, multiple candidates were interviewed for the position. Gerard was the top-rated candidate following the interviews. The Defendants further assert that, in recommending that Gerard be hired, Jackson believed that Gerard was the most qualified candidate and nobody influenced his recommendation. The Plaintiffs contend that Jackson's testimony has not been consistent with regard to the reasons for the hiring of Gerard. In his deposition, Jackson admitted that he was aware of Gerard's family relationship to Frazier and understood that because of that relationship, Gerard was the preferred candidate.

After the layoff, all of the Plaintiffs' positions were abolished and have not been recreated by CMS. Thus, no one has been hired to replace the Plaintiffs. In addition to abolishing positions that had employees currently serving in them, the layoff also abolished some unfilled positions. The Plaintiffs contend that these allegations are not relevant to the issues of whether they were laid off for political reasons or denied due process.

Because the positions were eliminated and Site Superintendents did not have bumping rights, it was not possible to transfer the Plaintiffs to other Site Superintendent positions. Although when the Blagojevich Administration took office it implemented what is commonly referred to as a "hiring freeze," in reality it implemented an electronic position action request process that requires agencies to get approval before vacancies can be filled. Since the layoff, two Site Superintendents that were laid-off with the Plaintiffs have been recalled to work at sites other than the ones from which they were laid off. Some assistant Site Superintendents have been promoted into vacant Site Superintendent positions and one new Site Superintendent was hired in March of 2006 to replace a retired Site Superintendent. During the FY 03 and FY 04 budget years, five Site Superintendents and two higher-level Public Service Administrators were hired. The Defendants allege that IDNR tries every year to hire people via new funding initiatives or restored funding during the fiscal year.

The Defendants allege that immediately prior to the layoff, three of the six Plaintiffs—West, Pinski and Oliver—were serving in Site Superintendent positions codified by CMS, based upon job descriptions as being *Rutan* exempt. The three Plain-

tiffs signed a number of performance reviews in which a block was checked "Yes" after the words: "Review of the employee's job description is required to ensure the accuracy of description. Does the job description accurately and directly relate to the objectives listed in the next part of this evaluation form?" During the time periods that the three Plaintiffs signed the evaluations, their official job descriptions indicated that their positions were *Rutan* exempt. An employee who thinks that his or her *Rutan* classification is wrong can administratively challenge the classification. On June 30, 2003, Plaintiff Myers's position was changed by CMS from being coded *Rutan* exempt to being *Rutan* protected. The Plaintiffs contend that many of the foregoing facts are immaterial.

## II. ANALYSIS

### A. *Summary judgment standard*

The entry of summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Rule 56(c) mandates the entry of judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. If a defendant can show the absence of some fact that the plaintiff must prove at trial, then the plaintiff must produce evidence, and not merely restate his allegations, to show that a genuine issue exists. *Sartor v. Spherion Corp.,* 388 F.3d 275, 278 (7th Cir.2004). The Court

construes all facts and makes all reasonable inferences in favor of the non-moving party. *Magin v. Monsanto Co.,* 420 F.3d 679, 686 (7th Cir.2005).

### B. *Political motivation and Plaintiffs' prima facie case*

#### (1)

■ The Defendants contend first that they are entitled to summary judgment on Count I because the Plaintiffs cannot make out a prima facie case of political motivation. The First Amendment typically protects an individual from being removed from public employment for purely political reasons, unless the position is one in which political beliefs or affiliation may be an appropriate requirement. *See Pleva v. Norquist,* 195 F.3d 905, 911 (7th Cir.1999) (citations omitted). The Seventh Circuit recently explained the standard:

> The First Amendment protects a person from being removed from public employment for purely political reasons, with certain exceptions for policymaking positions and employees having a confidential relationship with a superior. In order to establish a prima facie case for this type of employment discrimination, a plaintiff must demonstrate two things: first, that her conduct was constitutionally protected, and second, that the protected conduct was a substantial or motivating factor in the employment decision. A plaintiff's claim will fail if she merely shows that she was of a different political persuasion than the decision makers or the successful applicant. If a plaintiff can make out a prima facie showing, the burden then shifts to the defendant to demonstrate that there was a legitimate, non-political reason for the employment decision.

*Zerante v. DeLuca,* 555 F.3d 582, 584–85 (7th Cir.2009) (internal citations omitted).

■ The Defendants concede that the Plaintiffs who assert that they were laid off because they were affiliated with the Republican Party can meet the first element of the prima facie requirement. All of the Plaintiffs except West allege that they were discharged because of political affiliation.[6] Thus, whether most of the Plaintiffs can allege a prima facie case will turn on the second element. "A motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions." *George v. Walker*, 535 F.3d 535, 538 (7th Cir.2008) (quoting *Mullin v. Gettinger*, 450 F.3d 280, 284 (7th Cir.2006)). This can be established "by showing that the protected speech caused, or at least played a substantial part in, the employer's decision to take adverse employment action against the plaintiff." *Mullin*, 450 F.3d at 284.

■ The Court concludes that the Plaintiffs are unable to show that the Defendants were aware of their political activities. Therefore, they are unable to show that this was a motivating factor in the layoff decisions. It is undisputed that two of the Defendants, Frazier and Flood, were not involved with the layoff in any way and were not working at IDNR at the time of the layoff. Moreover, it is not disputed that three of the remaining Defendants, Curry, Brunsvold[7] and Sheriff, either did not know the Plaintiffs or did not know that they were on the layoff list. Thus, five of the Defendants could not have considered the Plaintiffs' political affiliation or activities in deciding that they should be discharged. Regarding these Defendants, therefore, the Plaintiffs are unable to establish that their political affiliation was a substantial or motivating factor for the layoffs.

The Defendants also assert that there is no evidence that the other Defendants—Mayville, Cusamano and Jackson—were aware of the Plaintiffs' political affiliations or activities. The Plaintiffs admit that Mayville did not know the political affiliation of any of the Plaintiffs. Moreover, the Plaintiffs acknowledge that Cusamano did not participate in or hear about any discussions wherein the political affiliation of employees who might be laid off was discussed and she did not know if any of the employees who were laid off had support from any political party or administration. Additionally, it is undisputed that Jackson did not participate in and was not aware of any discussions concerning the layoffs wherein political affiliation or political support of any IDNR employees was discussed and he does not believe political affiliation or support had any influence over who was selected to be laid off. Jackson was not involved in the layoff selection process.

The Plaintiffs essentially admit that none of the Defendants were aware of their political activities. "If [the decision-maker] did not know that [the plaintiff] was a Republican, he could not have fired her because she was a Republican." *Cusson–Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir.1992). In that case, the Seventh Circuit determined that summary

---

6. West seems to allege that he was included on the layoff list because of his aggressive questioning of Mayville and others about funding priorities at a July 2004 regional land management meeting.

7. The Court notes that, in their response to the Defendants' summary judgment motion, the Plaintiffs neither admitted nor disputed the Defendants' alleged Undisputed Material Fact (Number 15) as to Brunsvold's knowledge. Moreover, the Plaintiffs do not allege that the Undisputed Material Fact is immaterial. Because the Plaintiffs do not dispute that fact, the Court assumes that they have no opposition to it.

judgment was appropriate when the plaintiff alleged that political affiliation was a motivating factor in her discharge, but failed to dispute her superior's affidavit which denied any knowledge of her political affiliation. *See id.* That court recently reiterated that knowledge is the "threshold question" in determining whether political affiliation was a substantial or motivating factor in an employee's discharge. *See Zerante,* 555 F.3d at 585. It concluded that the plaintiff did not present enough evidence to clear the initial hurdle that the decision-makers were aware of her political affiliation. *See id.*

Similarly in this case, the Plaintiffs have not disputed that the Defendants were unaware of their political activities. The Plaintiffs attempt to get around the knowledge requirement by arguing that the Defendants had political favorites who they wanted to retain and the only way to ensure that was to discharge the Plaintiffs. Even if this were enough to satisfy the knowledge requirement, however, it is based mostly on the Plaintiffs' speculation. Because the Plaintiffs have failed to create a genuine issue of material fact as to whether their protected conduct was a substantial or motivating factor in the layoff decision, the Plaintiffs are unable to make out a prima facie case as to their First Amendment claims contained in Count I. Accordingly, the Defendants are entitled to summary judgment on those claims.

(2)

■ The Court further concludes that, even if the Plaintiffs were able to assert a prima facie case, they are unable to establish that the Defendants' legitimate, non-discriminatory reason for the layoff—budget cuts—is a pretext for an unlawful reason. It is undisputed that, after the budget was passed by the legislature, it was left to IDNR to determine how the head-

count reduction would be made. The Plaintiffs also admit that the need for a reduction was communicated by IDNR's fiscal office to IDNR leadership. Moreover, in conjunction with the IDNR fiscal office, IDNR leadership gave each Office Director a specific budget number that each office had to meet. The Plaintiffs acknowledge that the IDNR fiscal office was the entity "driving" the numbers to each Office Director and the Office Directors worked with the fiscal office regarding the exact amount of headcount and spending they had to reduce. It is also undisputed that, regarding the Plaintiffs' layoff, Defendant Mayville was informed that he had to layoff approximately 60 employees.

■ In contending that the Defendants' asserted reason for their layoffs is a pretext, the Plaintiffs rely on the testimony of Neal Booth, who has been employed by IDNR for 39 years and has been a Site Superintendent since 1975. The Plaintiffs contend that, in his role representing Site Superintendents in collective bargaining, Booth has had significant experience analyzing and addressing budget issues as they relate to IDNR. The Plaintiffs assert that Booth provided evidence that there was enough money in the IDNR budget to provide for their salaries, thereby showing that there at least is a factual issue regarding whether the Defendants' proffered reason is a pretext.

The Court agrees with the Defendants' assertion that Booth's opinions on this issue are immaterial. Booth testified that he is a high school graduate with no specialized training in accounting or budget analysis. The Court concludes, moreover, that Booth's employment as a Site Superintendent does not qualify him to opine as to the sufficiency of funds to retain those positions.

Even assuming they could make out a prima facie case on their First Amendment claims, the Plaintiffs are unable to point to any evidence tending to show that the Defendants' reason for the layoffs is pretextual. Accordingly, the Defendants are entitled to summary judgment on Count I.[8]

## C. Due Process claims

### (1)

■■ The Defendants contend they are entitled to summary judgment on the Plaintiffs' due process claims because the Civil Service Commission provided the Plaintiffs with due process. "Employment rights are state-created rights, and a public employee's interest in continued employment does not rise to the level of a "fundamental" right protected by substantive due process." *Horstmann v. St. Clair County, IL,* 295 Fed.Appx. 61, 64 (7th Cir.2008) (citations omitted). The Defendants note that, pursuant to the Illinois Personnel Code, the Plaintiffs have a property right which entitles them to procedural due process. *See Salm v. Broncato,* 149 F.Supp.2d 511, 519 (C.D.Ill.2001). To establish a due process claim, a plaintiff must demonstrate "(1) that he had a constitutionally protected property interest, (2) that he suffered a loss of that interest amounting to a deprivation, and (3) that the deprivation occurred without due process of law." *Moss v. Martin,* 473 F.3d 694, 700 (7th Cir.2007).

■ An individual with a property interest in his employment is entitled to a hearing prior to being terminated. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The Court noted that a post-deprivation hearing will satisfy due process requirements in some instances. *See id.* at 542 n. 7, 105 S.Ct. 1487. Notice and an opportunity to respond is required. *See id.* at 546, 105 S.Ct. 1487. In this case, the Civil Service Commission afforded the Plaintiffs a meaningful opportunity to respond, prior to the Commission's Findings and Decision.

■ The Plaintiffs do not seriously dispute that the Civil Service Commission proceeding satisfied due process. They rely on their argument that the Commission's findings are not entitled to preclusive effect because the Plaintiffs did not have an opportunity to testify, subpoena witnesses, or otherwise fairly litigate their claims. Although that position might be tenable if the Defendants were arguing that the Court must accept the Civil Service Commission's finding as a matter of issue preclusion [9] that budget cuts were the reason for the layoff, the Court's inquiry here is limited to whether the Commission satisfied due process. The Court concludes that it did. Accordingly, the Defendants are entitled to summary judgment on the Plaintiffs' due process claims.[10]

---

**8.** The Court further finds that summary judgment in favor of the Defendants as to Count I is also warranted on the basis of qualified immunity. The Plaintiffs cannot show that the Defendants' actions violated clearly established law, when the Plaintiffs were laid off for budgetary reasons. The record establishes that the Defendants were not aware of the Plaintiffs' political affiliation. Thus, a reasonable individual in the position of any Defendant would not have known that his actions were unlawful.

**9.** The Defendants made this argument in contending that the Plaintiffs could not show that their asserted reason for the layoffs is a pretext. Having concluded independent of the Commission's findings that there was no genuine issue of material fact that the layoffs resulted because of budget cuts, the Court did not discuss issue preclusion.

**10.** Additionally, summary judgment in favor of the Defendants on Count II is warranted on the basis of qualified immunity. The Defendants were not personally involved in the

### III. CONCLUSION

Having concluded for the reasons discussed that the Defendants are entitled to summary judgment on Counts I and II, the Court need not address the additional reasons offered by the Defendants regarding why summary judgment should be entered in their favor. The Plaintiffs acknowledge that they are not seeking economic damages against the Defendants in their official capacities, which would be a suit against the State itself. *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). The Court notes that the Plaintiffs' complaint requested injunctive relief in the form of reinstatement and preventing the Defendants from taking any other retaliatory action. To the extent that the Plaintiffs continue to seek injunctive relief against the Defendants in their official capacities, that request is denied on the basis that the Defendants are entitled to summary judgment on Count I and II.

*Ergo,* the Defendants' motion for summary judgment is ALLOWED.

The Clerk will enter judgment in favor of the Defendants.

This case is closed.

Civil Service Commission proceeding. Therefore, they are not responsible for the alleged due process deprivation.